# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

Kevin M. Bailey,

 *Plaintiff,*

v.

Thomas Dart, Sheriff of Cook County and
Cook County, Illinois,

 *Defendants.*

No. 21 CV 3196

Judge Lindsay C. Jenkins

### MEMORANDUM OPINION AND ORDER

Plaintiff Kevin Bailey ("Bailey" or "Plaintiff") brings this § 1983 suit against Cook County, Illinois and its Sheriff, Thomas Dart, for damages arising out of Defendants' alleged failure to provide him with adequate dental care while he was a pretrial detainee at the Cook County Jail, in violation of the Fourteenth Amendment's Due Process Clause. Currently before the Court is Defendants' motion for summary judgment [Dkt. 70]. For the reasons explained below, the motion is granted in part and denied in part. Defendants are entitled to summary judgment on Bailey's *Monell* claim to the extent that it is premised on (1) the alleged understaffing of the Division 6 dental clinic or (2) inoperable suction equipment in Division 6. But Defendants are not entitled to summary judgment on the *Monell* claim to the extent that it is based on Defendants' alleged widespread practice of delayed dental evaluations.

## I.    Background

The following facts are taken from the parties' Local Rule ("L.R.") 56.1 Statements and accompanying exhibits [Dkts. 71, 76, 77, 82] and are undisputed except where a dispute is noted.

### A.    The Parties

Bailey was an inmate at the Cook County Jail ("Jail") from April 24, 2019, until April 6, 2020, when he was discharged and placed on electronic monitoring. This case concerns the dental care that Bailey received while living in Division 6 of the Jail as a pretrial detainee. Defendant Cook County, Illinois, provides dental services for inmates housed at the Jail. Defendant Thomas Dart ("Dart") is the Sheriff of Cook County and is sued in his official capacity only. At all relevant times, Dr. Jorelle Alexander ("Alexander") was the Chair of the Department of Oral Health for Cook County Health. Dr. Kahina Caldwell ("Caldwell") (whose last name is now King) was the Correctional Chief of Dental Services for Cermak Health Services ("Cermak").

Bessie Roddy ("Roddy") was the dental assistant in the Division 6 dental clinic. Dr. Thomas Prozorovsky ("Prozorovsky") worked in the Division 6 dental clinic until his retirement in December 2018. After Dr. Prozorovsky retired, Dr. Alexander, Dr. Caldwell, Dr. Brenda Taylor ("Taylor"), and Dr. Rhay Street ("Street") took over providing dental care to Division 6 detainees on a rotating basis; however, Bailey emphasizes that there was a doctor assigned to work in Division 6 only 2 days per week. [See Dkt. 76, ¶ 24.] Dr. Maura Parker also provided dental care to Division 6 detainees for a few months in April and May 2019. [See *id.*]

2

### B.    The Jail's Procedures for Requesting Dental Services

Detainees housed at the Jail may request non-emergency dental services by filling out a health service request form ("HSRF"). The Jail's guidelines concerning HSRFs require patients with subjective complaints classified as "urgent" to be seen within 72 hours. [Dkt. 76, ¶ 11.] Patients whose complaints are classified as "priority" are to be seen within 14 days, and patients with "routine" complaints are to be seen within 30 days. [See *id.*] These guidelines originate from the policy directed by the medical monitor in *Unites States v. Cook County*, Case No. 10-cv-2946 (N.D. Ill.). [See Dkt. 76, ¶ 11.][1] In addition, if a detainee has an emergency dental condition—such as a "fractured jaw" or "massive swelling"—he may be transported directly to the Jail's dispensary (which is open during the day) or the Jail's urgent care clinic (which is open 24 hours per day, 7 days per week). [See Dkt. 76, ¶ 6.]

It is disputed what happens when an inmate fills out an HSRF. According to Defendants and Dr. Alexander, if a detainee complains of a toothache on the HSRF, the detainee is transported to the dispensary where a nurse assesses the detainee face-to-face. [*Id.*, ¶ 7.] The nurse may call the dental clinic or walk the HSRF to the dental clinic or urgent care. [*Id.*, ¶ 9.] However, Bailey disputes that it is normal for a detainee who complains of dental pain on an HSRF to receive a face-to-face evaluation from a nurse. [See *id.*, ¶ 7.]    Registered nurse Omeke Dannydan ("Dannydan"), who is a Division 6 charge nurse, testified that the general practice is

---

[1]    That case was closed on June 26, 2018, with a docket entry indicating that "Cook County has achieved the conditions required to terminate all of its responsibilities under the Agreed Order." Case No. 10-cv-2946, Dkt. 377.

to conduct a paper triage of a HSRF when the detainee complains of dental pain rated 10 and to refer it to the dental office unless "it's the weekend where there's no dental, we could do face to face and see what his condition is, what his pain is; and if needed, we can give him over the counter." [*Id.*]

The summary judgment record is not entirely clear concerning how the HSRFs make their way to the appropriate dental clinic so that dental treatment can be scheduled. According to dental assistant Roddy, she would get the HSRFs either by picking them up at the commissary or from the website "dentalreferral." But the record suggests that the process of picking up hard copies of the HSRFs was disorganized, and the "dentalreferral" email system had fallen out of use by the time Bailey sought dental treatment. More particularly, in May 2018, Roddy reported to Dr. Prozorovsky that when she went to pick up the HSRFs from the commissary, there was "no organization system in place" and the forms were "spread out everywhere like Monday's wash." [Dkt. 76-9 at 12.]. As for the "dentalreferral" email system, dental assistant Davenport testified that the process to send HSRFs to an email box "didn't quite work" and at some point her supervisor, Dr. Alexander, stopped the process of having HSRFs scanned electronically. [Dkt. 76, ¶ 19.]

It is undisputed that when the Jail dental clinics receive the HSRFs, dental assistants are trained to and do review the HSRFs and classify them as urgent, priority, or routine according to the Jail's guidelines. [Dkt. 76, ¶ 13.] However, Bailey disputes that dental assistants are qualified to do this. [*Id.*, ¶¶ 12-13.] Defendants rely on Dr. Alexander's testimony that dental assistants are trained and qualified.

Bailey cites to Dr. Caldwell's testimony that the dental assistant has no role in determining whether a HSRF results in an urgent, priority, or routine evaluation by the dentist and testimony from Defendants' expert, Dr. Heike Olafsen ("Olafsen") that dental assistants are not qualified health professionals trained in assessing various medical conditions, as registered nurses are. [See *id.*]

Dr. Alexander performs periodic assessments to assess the productivity of the dental assistants by looking at their scheduling processes on the computer. [Dkt. 76, ¶ 13.] Dr. Alexander also performs periodic audits to ensure that patients who submitted HSRFs complaining of a toothache were timely seen by a dentist. [*Id.*] However, Dr. Alexander did not maintain anything in writing concerning her audits and did not recall how many charts she would examine during an audit. [Dkt. 76, ¶ 15.] She also could not recall if she did any audits during the period relevant to this lawsuit, May, June or July 2019. [*Id.*]

During the same time period, Dr. Caldwell observed dental assistants, gave them performance reviews, and conducted random audits of scheduling several times a year. [Dkt. 76, ¶ 16.] Dr. Caldwell testified that if she found anything she was concerned about or found instances where patients were not being seen within 72 hours of submitting an HSRF complaining of a toothache rated five or greater, she would address it with the dental staff. [*Id.*, ¶ 17.] Dr. Caldwell also testified that she spends "[v]ery little" time conducting administrative duties because she is "mostly in clinic everyday" treating patients. [*Id.*]

### C. Bailey's Jail Intake and Dental Treatment in Division 11

Bailey rarely saw a dentist before entering the Jail. Sometime in the second half of 2018, Bailey began noticing a toothache in the three back teeth of the top left side of his mouth. He did not call a dentist and simply took over-the-counter pain medication as needed. On the day Bailey entered the Jail, April 24, 2019, he went through the intake screening process and was seen by emergency response technician Lena Colon ("Colon"). Bailey reported "broke down teeth," but no dental pain. Colon entered a "routine" referral to the dental clinic.

Bailey was initially assigned to Division 11 at the Jail. On April 25, 2019, the dental assistant in Division 11, Tiffany Davenport ("Davenport"), scheduled Bailey for a routine dental appointment for May 14, 2019. Prior to his scheduled appointment, Bailey became sick with cold-like symptoms. He submitted an HSRF on April 30, 2019, which was collected on May 1. The same day, Bailey was seen by registered nurse Aishah Muhammad. Among other symptoms, he reported level 5 pain in his lower right molar and a toothache. Nurse Muhammad gave Bailey over-the-counter medication and noted that he had a dentist's appointment scheduled for May 14.

On May 14, Bailey was seen by Dr. Watson-Montgomery in the Division 11 dental clinic. Dr. Watson-Montgomery documented that Bailey had poor oral hygiene, with clinically gross decay of teeth #14, 15, and 16 (top left back teeth) and root tips of tooth #31 (bottom right back tooth). She documented Bailey's subjective pain level as a three. She also documented that Bailey was prescribed an antibiotic and

ibuprofen and "should be brought back within 7-10 days." [Dkt. 76, ¶ 37.] Dr. Caldwell, the chief of dental for Cermak Health Services, testified that returning the patient for follow-up within 7 to 10 days was the standard of care "because you do not want the patient to be off the antibiotic for an extended period." [*Id*.][2]

On May 20, 2019, Bailey was seen again in the Division 11 dental clinic. Instead of extracting the teeth indicated by Dr. Watson Montgomery, dental staff cleaned Bailey's teeth. The parties dispute who decided that the cleaning should precede the extractions. [See Dkt. 76, ¶ 43.] According to Defendants, Bailey chose to have his teeth cleaned before going forward with the extractions; Bailey denies this. Defendants rely on testimony from Dr. Watson Montgomery, but Bailey objects on the basis that Dr. Watson Mongomery had no recollection of treating Bailey and there is no documentation in the medical record that he chose to have a cleaning before extractions. At the May 20 appointment, the dental hygienist scaled and root planed Bailey's mandibular teeth without anesthesia using both an ultrasonic scaler and hand scaling. This is a procedure which could be very painful to a patient with sensitive gums or teeth. According to Defendants, Bailey's self-reported pain level was noted to be zero, but Bailey disputes this. According to Bailey, every time he was in a dental chair he explained that he was in pain: "The conversation has always been about the same problem teeth on every visit." [*Id.*, ¶ 42.]

---

[2] According to Defendants, Bailey was prescribed the antibiotic—amoxicillin—simply to reduce his bacterial load and to keep the balance and prevent any further acidic load, but Bailey presents conflicting testimony that the prescription of an antibiotic indicates the presence of an active infection. [See Dkt. 76, ¶ 38.]

Three days later, May 23, 2019, Bailey returned to the Division 11 clinic. Two bite wing x-rays were taken. On June 3, 2019, Bailey returned for his final dental hygiene visit in Division 11. The scaling and root planing of Bailey's maxillary arch was completed without anesthesia using both the ultrasonic scaler and hand scaling. It is disputed whether Bailey reported being in any pain during the May 23 or June 3 visits. [See *id.*, ¶¶ 44-45, 48-49.]

### D. Bailey's Dental Treatment in Division 6

On June 3, 2019, Bailey was transferred from Division 11 to Division 6 of the Jail. At that point, none of his teeth had been extracted. On June 9, 2019, Bailey submitted an HSRF that was collected on June 10, 2019. Bailey marked the box next to "toothache" and circled a pain level of ten. [Dkt. 76, ¶ 52.] Bailey wrote on the form that he could not chew on his "right upper side," an area of the mouth he had not previously complained about. [*Id.*] There is no record that the Division 6 dental clinic ever received Bailey's June 9, 2019 HSRF. [*Id.*, ¶ 53 (relying on Dr. Alexander's testimony).] According to Dr. Alexander, if the dental clinic had received the HSRF, the dental assistant would have scheduled a dental appointment on the day she received the HSRF. [*Id.*] But she had no record to show whether or when the HSRF was received. Dr. Alexander testified that "the reasons regarding the scheduling activity and the decisions around that scheduling activity are contained within 2019 with Ms. Roddy. I don't have that scheduling decisionmaking, that reason in regards to that because that is not documented." [*Id.*]

Dr. Maura Parker, a dentist who was assigned to Division 6 from April 2019 to May 2019, testified that there were piles of health service request forms for patients to be evaluated by the dentist and "obviously they started building up as I was unable to do any significant amount of treatment" due to the clinic's suction being inoperable. [Dkt. 76, ¶ 55.]

On June 11, 2019, Bailey submitted a grievance complaining of "swelling inside [his] mouth (gum) area, and along [his] cheek bone under right eye due to an infection." [Dkt. 76, ¶ 54.] On June 18, 2019, Dr. Alexander received Bailey's grievance and called the Division 6 dental clinic the same day to have Bailey placed on the schedule to see a dentist. The dental assistant scheduled Bailey for a June 21, 2019 appointment, which was subsequently rescheduled to June 24, 2019. [*Id.*, ¶ 55.]

On June 24, 2019, Bailey was seen by Dr. Street in the Division 6 dental clinic. According to Dr. Street's notes, Bailey's self-reported pain level was zero, but Bailey disputes this, as he does with all his dental visits. Dr. Street testified at his deposition that Bailey's pain was likely caused by a big cavity in tooth #15. [Dkt. 76, ¶ 56.] He also recognized that tooth #14 was infected. [*Id.*] (This is consistent with the testimony of Bailey's expert Dr. Anita Lockhart, DDS, that "there was oral pathology around tooth 14," which Dr. Street did not document. [*Id.*, ¶ 57.]) Dr. Street testified that Plaintiff's pain was more likely to come from tooth #15 because tooth #14 had no nerve or pulp chamber left. [See *id.*, ¶ 56.] According to Dr. Street's documentation, Bailey consented to have only tooth #15 extracted, so that was the only tooth Dr. Street extracted that day. According to Bailey's testimony, what really happened at

9

the appointment was that Dr. Street told Bailey "I'm only going to deal with one tooth today, so you pick which one it's going to be" and Dr. Street proceeded to pull one tooth, #15. [*Id.*, ¶ 57.]

On June 25, 2019, Bailey submitted an HSRF that was collected on June 26, 2019. In the HSRF, Bailey complained of pain from where the dentist extracted his tooth. Bailey did not complain of any pain from the teeth that were not extracted. On July 5, 2019, Bailey was seen by Jeelan Muhammad, Registered Nurse, and was assessed face-to-face. Bailey does not dispute that this encounter occurred, but he does not recall it. [See Dkt. 76, ¶ 60.] Nurse J. Muhammad documented that Bailey had seen the dentist already, his tooth was healed, and no further medical interventions were warranted at that time. [*Id.*] Nonetheless, Bailey was scheduled for a "'CHS Dental HSRF – Urgent' Appointment for July 12, 2019." [*Id.*, ¶ 61.]

On July 12, 2019, Bailey was seen by Dr. Taylor in the Division 6 dental clinic. Defendants assert based on Taylor's deposition testimony that Bailey did not complain of pain and was not in distress or swollen; but Bailey maintains that at the July 12 visit, just like every other visit, he explained that he was having pain. [See Dkt. 76, ¶ 62.] Dr. Taylor charted that Bailey refused treatment, but later charted that was written in error. Bailey was to be rescheduled for treatment "as the dental operatory was noted to be inoperable that day by Dr. Taylor." [*Id.*, ¶ 63.]

Bailey remained at the Jail for several more months until April 6, 2020, but was never rescheduled for treatment. During that time, Bailey did not submit another HSRF for dental services or any grievances for dental services or pain

medication, and he purchased a variety of hard and sweet foods at the commissary. On April 6, 2020, Bailey was discharged from the Jail and placed on electronic monitoring. While on electronic monitoring, he was able to request permission to leave his home to seek medical and dental care. Bailey made over fifteen requests to go grocery shopping or to a laundry facility, but did not request to seek dental care until May 13, 2021, over one year after being released from the Jail on electronic monitoring.

### E. This Lawsuit and Alleged Systemic Problems In Division 6

Bailey brings suit against the County and Sheriff Dart in his official capacity under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Plaintiff seeks to hold the County and Sheriff responsible for "policies and customs that deprive inmates of their federal rights[,] even if no individual official is found deliberately indifferent." *Miranda v. County of Lake*, 900 F.3d 335, 344 (7th Cir. 2018) (citing *Glisson v. Indiana Dep't of Corrections*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc)). In his governing complaint, Bailey alleges that he was forced to suffer prolonged and gratuitous dental pain as a result of two Jail policies. First, Bailey alleges that the Division 6 dental clinic was grossly understaffed at the time he received care there. [See Dkt. 1, ¶ 29.] Second, Bailey alleges that "there have been systemic deficiencies with the scheduling of inmates for dental appointments that render dental treatment constitutionally inadequate for all inmates with serious dental ailments." [*Id.*, ¶ 30.] "Each clinic's dental assistant has complete responsibility to schedule patients for treatment," and "[t]he dental assistants have no oversight by the clinic's assigned

11

dentist." [*Id.*] As a result, "inmates in need of urgent treatment by a dentist wait weeks, even longer, for dental appointments." [*Id.*] Bailey concludes that "[a]s a direct and proximate result of defendants' failure to correct this obvious defect in the policy of scheduling patients for dental care and the inadequate staffing, plaintiff experienced gratuitous pain and incurred personal injuries and was deprived of rights secured by the Fourteenth Amendment to the Constitution of the United States." [*Id.*, ¶ 34.]

### 1. Staffing

According to Dr. Alexander's testimony, one dentist is required to staff the Division 6 dental clinic. [Dkt. 76, ¶ 25.] When Dr. Prozorovsky retired in December 2018, dentists from other divisions provided care in Division 6 on a rotating basis, but only provided two days of coverage in Division 6, on Mondays and Fridays. [See *id.*, ¶¶ 24-25.] Dental assistant Roddy testified that access to care would improve for Division 6 detainees if a dentist was assigned to the clinic on Tuesdays, Wednesdays, and Thursdays because "[m]ore days. The whole week is open." [*Id.*, ¶ 26.] More generally, it is difficult to adequately staff the Jail with dentists. Dr. Caldwell testified that there have always been open dentist positions at the Jail and that as of August 28, 2019, there were three open positions. [Dkt. 82, ¶ 75.]

### 2. Scheduling

Historically, the Jail has experienced issues with scheduling inmates for timely dental care. For instance, Bailey points to a September 2013 email from Dr. Ronald Townsend, the former chief dentist at the Jail, noting that the scheduling process is

inefficient and that appointments, including ones sought through HSRFs, were not scheduled appropriately. [Dkt. 82, ¶ 7.]

From 2010 through 2018, Defendants operated under an agreed order in *United States v. Cook County*, Case No. 10-cv-2946 (N.D. Ill.), which the Department of Justice filed against Cook County to protect the constitutional rights of inmates housed at the Jail. The agreed order set standards for "timeliness of Health Service Request Forms" and directed urgent forms—meaning a patient complaining of pain rated 6 or greater—to receive a dental evaluation within 72 hours. [Dkt. 82, ¶ 17.]

Until May 2018—when the Department of Justice stopped monitoring Defendants—Dr. Alexander required the Division 6 dental clinic staff to document receipt of every HSRF and identify when the patient was evaluated by a dentist. Dr. Alexander used this data to prepare reports for the medical monitors. In a May 21, 2018 email to Dr. Prozorovsky and dental assistant Roddy at the end of the monitoring period, Dr. Alexander expressed that the Division 6 "DOJ numbers were horrible" in the last monitoring report and HSRFs were not being timely scheduled. [Dkt. 82, ¶ 38.] Nonetheless, after May 2018, Dr. Alexander stopped documenting when the Division 6 dental clinic received each HSRF and when the patient saw a dentist. [*Id.*, ¶ 18.] Consequently, Dr. Alexander has no knowledge of any data identifying whether patients are timely evaluated. [*Id.*, ¶ 19.]

### 3. Equipment

The summary judgment record contains evidence that during the period when Bailey received dental care in Division 6, the dental clinic was experiencing problems

with its suction equipment. As late as August 28, 2019, Dr. Caldwell stated the "Division 6 suction is currently out" and she believed the malfunction originated in April. [Dkt. 77, ¶ 29.] Suction is necessary for a dentist to extract teeth; it is a violation of appropriate community standards to extract teeth without suction. [*Id.*, ¶ 27.] In October 2018, Ms. Roddy started requesting defendants to repair the Division 6 suction equipment because it was "100% down." [*Id.*, ¶ 28.] Dr. Parker "could hardly do anything without suction." [*Id.* ¶ 29.] On May 8, 2019, Dr. Parker sent Dr. Alexander an e-mail explaining "[w]e have piles of yellow request slips" (meaning HSRFs) and that she was unable to treat most patients due to the broken suction. [*Id.*, ¶ 39.] Dr. Parker said "it seems unlikely" that Drs. Alexander and Caldwell "would not be aware" that she was unable to treat Division 6 patients. [*Id.*]

### 4. Experts

Each side has retained an expert to provide an opinion on the dental care that Cook County provided to Bailey. Defendants' expert, Dr. Olafsen, opines that Bailey received more than appropriate and reasonable dental care at the Jail and was not harmed in any way. He also opines that the Jail's dental staff are well trained to do their expected duties and that, due to this training, Bailey was appropriately referred and scheduled for routine dental treatment based on his subjective pain levels and examinations. [See Dkt. 76, ¶ 74.] In addition, Dr. Olaffsen opines that the staffing level was adequate to provide treatment to patients in the Division 6 dental clinic. [*Id.*, ¶ 75.] He emphasizes that dental staff were able to rotate among divisions as

needed and that detainees could be sent to other divisions for treatment if necessary.

[*Id.*]

Bailey's expert, Dr. Anita Lockhart, reaches the opposite conclusions. She opines that Bailey was harmed because of treatment delays at the Jail, with Bailey's pain evolving from "moderate" to "severe" by June 3, 2019. [Dkt. 76, ¶ 73.] She summarizes her three opinions as follows [Dkt. 76-9 at 4]:

> My first opinion is that there are deficiencies in the oversight of dental care in the Division 6 dental clinic. I believe there are systemic delays for detainees to be evaluated after completing a health service request form which should have resulted in an urgent appointment. These deficiencies include lack of written policies, insufficient triage training for nursing and dental staff, as well as the lack of oversight of the staff performance.

> My second opinion is that staffing and clinic's physical plant functionality is inadequate to manage the dental needs of the Division 6 inmate population. This results in delays and lapses in dental care.

> My third and final opinion is that Mr. Bailey was harmed because of the delays and lapses of dental care he required.

## II. Legal Standard

The Court should grant summary judgment where there is no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law. See Fed. R. Civ. P. 56(a); see also *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); see also *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and . . . draw[s] all reasonable

inferences from that evidence in favor of the party opposing summary judgment." *Skiba*, 884 F.3d at 717. In doing so, the Court may not weigh conflicting evidence or make credibility determinations. See *Johnson v. Advocate Health & Hospitals Corp.*, 892 F.3d 887, 893 (7th Cir. 2018). Further, the Court must give the nonmovant "the benefit of reasonable inferences from the evidence, but not speculative inferences in [her] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (citation omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

## III. Analysis

Bailey brings his § 1983 claims against the County and against Sheriff Dart in his official capacity. Under *Monell*, 436 U.S. 658, a plaintiff may bring a § 1983 suit against a county when its actions violate the Constitution. *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020); see also *Deeren v. Anderson*, 72 F.4th 229, 237 (7th Cir. 2023). "As an Illinois sheriff, [Dart] has final policymaking authority over [J]ail operations." *Miranda*, 900 F.3d at 344. Therefore, he is the proper party for an official liability claim alleging policies "that deprive inmates of their federal rights." *Id.*; see also *Turner v. Cook Cnty. Sheriff's Office by and through Dart*, 2020 WL 1166186, at *3 (N.D. Ill. Mar. 11, 2020).

As the "first step in every § 1983 claim," including a claim against a county under *Monell*, the "plaintiff must initially prove that he was deprived of a federal right." *First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d

16

978, 987 (7th Cir. 2021); *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). To ultimately succeed on a *Monell* claim, the plaintiff must "prove three elements: (1) an action pursuant to a municipal policy, (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation, meaning the municipal action was the 'moving force' behind the constitutional injury." *Hall*, 953 F.3d at 950. "These requirements—policy or custom, municipal fault, and 'moving force' causation—must be scrupulously applied in every case alleging municipal liability" to avoid collapsing municipal liability into *respondeat superior* liability. *LaPorta*, 988 F.3d at 987.

## A. Deprivation of a Federal Right

Bailey was a pretrial detainee when the events giving rise to this lawsuit occurred, and therefore his § 1983 challenge to his medical care arises under the Fourteenth Amendment's Due Process Clause. *Miranda*, 900 F.3d at 350. "For pretrial detainees asserting due process claims for inadequate medical care, the standard of objective reasonableness, and not deliberate indifference, governs." *Bridges v. Dart*, 950 F.3d 476, 479 n.2 (7th Cir. 2020). Pretrial detainees bringing due process medical claims must demonstrate (1) that the defendant acted purposefully, knowingly, or recklessly, and (2) that the defendant's conduct was objectively unreasonable. *Id.*; see also *Miranda*, 900 F.3d at 353-54; *Redman v. Downs*, 854 Fed. Appx. 736, 738 (7th Cir. 2021). At the second step, the Court focuses "on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care" and seeks "to gauge objectively—without regard to any

17

subjective belief held by the individual—whether the response was reasonable." *McCann v. Ogle Cnty., Illinois*, 909 F.3d 881, 886 (7th Cir. 2018). "Said more succinctly, [Bailey] must demonstrate that genuine issues of material fact exist on two questions: (1) whether he suffered from an objectively serious medical condition and (2) whether the medical staff's response to it was objectively unreasonable." *Williams v. Ortiz*, 937 F.3d 936, 942–43 (7th Cir. 2019).

Defendants argue that the undisputed summary judgment record shows that Bailey did not have an objectively serious dental condition and that he received objectively reasonable dental care.

### 1. Bailey's dental condition

According to Defendants, Bailey did not have an objectively serious dental condition. Defendants emphasize that Bailey did not seek dental treatment for his toothache before entering the Jail; he was "seen four times in the Division 11 dental clinic and received an examination by the dentist and a thorough cleaning by the dental hygienist"; once he was transferred to Division 6 he had tooth #15 extracted on June 24, 2019; and after two follow-up appointments in July 2019, he did not submit any other HSRFs or grievances for further dental services until he was discharged from the Jail in April 2020. [Dkt. 72 at 6-7.]

A jury must be allowed to assess whether Bailey suffered from an objectively serious dental condition. Bailey identifies two factually similar cases [see Dkt. 78 at 8-9], which Defendants fail to address in their reply [see Dkt. 83]. In *Dobbey v. Mitchell-Lawshea*, 806 F.3d 938 (7th Cir. 2015), the Seventh Circuit reversed the

district court's grant of summary judgment to prison medical providers on the plaintiff's claim that they were deliberately indifferent to his tooth abscess. According to the Seventh Circuit, "the district judge failed to appreciate the gravity of a tooth abscess or attach sufficient weight to the slack response" to it: "A tooth abscess is not a simple toothache. It is a bacterial infection of the root of the tooth, and it can spread to the adjacent gum and beyond—way beyond." *Id.* at 940. Similarly, in *Thompson v. Taylor*, 2016 WL 5080484, at *6 (N.D. Ill. 2016), the district court found that a tooth that was damaged badly enough to require an extraction was a serious medical condition.

The facts are similar here. At Bailey's May 14, 2019 dental visit, Dr. Watson-Montgomery documented that the damage to Bailey's teeth was so serious that they required extraction. She also prescribed him an antibiotic, amoxicillin, which are generally prescribed when a patient has an infection. Dr. Alexander testified that an infection can "spread to a patient's head through the bloodstream and the only way to remove the source of the infection" is an extraction. [Dkt. 82, ¶ 16.] Bailey's expert, Dr. Alexander, and Dr. Caldwell all agreed that the standard of care requires a patient to return to the dentist within seven to ten days after the administration of an antibiotic. Yet Bailey went nearly six weeks between receiving an antibiotic and having tooth #15 extracted. And by the time he submitted his HSRFs on June 10, 2019, he reported his pain had increased to a level ten. Based on this record, the Court is satisfied that a jury must be allowed to assess whether Bailey has shown that he

19

suffered from an objectively serious dental condition for at least the weeks leading up to the June 24 extraction.

### 2. Defendants' response

Defendants also argue that they are entitled to summary judgment on the basis that Bailey received objectively reasonable treatment for the tooth that Dr. Street extracted on June 24, 2019 (tooth #15) and the teeth that were never extracted (#14, #16, and the root tip of #31). The Court finds it unnecessary to discuss the evidence on a tooth-by-tooth basis to conclude that the objective reasonableness of Defendants' response to Bailey's serious dental condition must be determined by a jury.

In their discussion of the care that Bailey received, Defendants largely ignore Bailey's two-week wait between submitting his June 9, 2019 HSRF reporting "level 10" pain and seeing a dentist. [See Dkt. 72 at 6.] A reasonable factfinder could find, at a minimum, that the Jail medical staff's delayed response to his complaints of level-10 dental pain between June 9 and June 24, 2019, was objectively unreasonable under the circumstances—which also included a medical record showing that Bailey was in need of extractions and had been receiving an antibiotic, indicating an active infection. The Jail's own guidelines require care for urgent dental conditions within 72 hours. There is no evidence in the record that Bailey received any care until two weeks after he complained of level-10 pain.

In addition, Defendants fail to address *Dobbey* or *Thompson*, in which summary judgment was inappropriate based on similar delays in providing dental

treatment. See *Dobbey*, 806 F.3d at 940 (genuine issue of material fact as to whether prison dentist acted with deliberate indifference to prisoner's serious medical need, where dentist examined prisoner 16 days after learning he had a tooth abscess); *Thompson*, 2016 WL 5080484, *2-3 (denying defendants' motion for summary judgment on deliberate indifference claim based on delay in providing dental treatment for chipped tooth, which was infected and needed to be removed, where plaintiff waited two weeks until he received a painkiller and one month until the tooth was extracted).

### B.    Policy, Culpability and Causation

Having made a sufficient showing that he was deprived of a federal right, Bailey must next "trace the deprivation to some municipal action (*i.e.*, a 'policy or custom'), such that the challenged conduct is 'properly attributable to the municipality itself.'" *Dean*, 18 F.4th at 235 (citing *LaPorta*, 988 F.3d at 987). In *Glisson*, 849 F.3d at 379 (7th Cir. 2017), the Seventh Circuit summarized this element:

> The critical question under *Monell*, reaffirmed in *Los Angeles [County] v. Humphries*, is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents. There are several ways in which a plaintiff might prove this essential element. First, she might show that "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Second, she might prove that the "constitutional deprivation was visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." Third, the plaintiff might be able to show that a government's policy or custom is "made ... by those whose edicts or acts may fairly be said to represent official policy." As we put the point in one case, "a person who wants to impose

liability on a municipality for a constitutional tort must show that the tort was committed (that is, authorized or directed) at the policymaking level of government ....” Either the content of an official policy, a decision by a final decisionmaker, or evidence of custom will suffice.

In this case, Bailey relies on several alleged widespread customs to support his *Monell* claim. In its “extensive case law on prison healthcare,” the Seventh Circuit has “not adopted bright-line rules regarding the quantity, quality, or frequency of conduct needed to prove a widespread custom or practice under *Monell*.” *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 654 (7th Cir. 2021) (citing *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010)). Yet “there can be little doubt that a practice or custom theory will be more persuasive if a plaintiff can show that the defendant government or company treated other, similarly situated patients in similar unconstitutional ways.” *Id.* at 655; see also *Palmer v. Marion Cty.*, 327 F.3d 588, 596 (7th Cir. 2003) (“proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference”). “[W]hat is needed is evidence that there is a true municipal [or corporate] policy at issue, not a random event.” *Grieveson*, 538 F.3d. at 774.

In opposition to Defendants’ motion for summary judgment, Bailey “points to the grossly deficient staffing (the absence of an assigned Division 6 dentist), a widespread pattern of delayed dental evaluations, and the broken suction equipment as the basis to hold defendants liable.” [Dkt. 78 at 1.]

### 1. Nonfunctional suction equipment

A threshold issue raised in Defendants’ reply brief is whether Bailey should be allowed to pursue a *Monell* claim premised on the Division 6 dental clinic’s broken

22

suction equipment, since that issue is not mentioned in Bailey's complaint [Dkt. 1]. "A party may not amend its Complaint through its Response to a motion for summary judgment." *Hexagon Packaging Corp. v. Manny Gutterman & Associates Inc.*, 120 F. Supp. 2d 712, 718 (N.D. Ill. 2000) (citing *Speer v. Rand McNally & Co.*, 123 F.3d 658, 665 (7th Cir. 1997)); see also *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012). Since the complaint does not mention the suction equipment (or broken or insufficient equipment more generally), and Bailey has not sought leave to amend the complaint, the Court will not consider the broken suction equipment as a separate basis for *Monell* liability. Nonetheless, evidence concerning the suction equipment is relevant to Bailey's *Monell* challenge based on Defendants' alleged widespread pattern of delayed dental evaluations and policy of leaving the scheduling of urgent dental requests solely to the dental assistants, with essentially no oversight. According to Bailey, a variety of known problems in Division 6 impact the dental assistants' ability to do their jobs—including things like the broken suction equipment, staffing challenges, and lack of coordination and oversight.

### 2.      Staffing

Bailey alleges that the Division 6 dental clinic was grossly understaffed, causing a widespread pattern of delaying treatment for inmates with urgent dental conditions. To survive summary judgment on this theory, Bailey must present evidence of "systemic and gross deficiencies in staffing." *Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016). To evaluate the sufficiency of Division 6's staffing, it would be useful to have data concerning the number of inmates who required

appointments during a given period, along with data on the number of appointments available during the same period. Neither party has submitted such evidence, so the Court must do the best it can with the evidence proffered by the parties. That evidence shows that there is a material question of fact as to whether the Division 6 dental clinic was inadequately staffed in May, June and July 2019.

Dr. Alexander testified that one dentist is required to staff Division 6. A reasonable reading of this testimony is that one full-time dentist is needed, or equivalent coverage provided by rotating dentists. Dr. Prozorovsky was full-time prior to his retirement, and the dentists who rotated into Division 6 from other divisions of the Jail did not provide the same coverage as one full-time dentist. The two days of coverage they provided on Mondays and Fridays were equivalent to 16 hours, not 40 hours, of dentist availability. Nurse Roddy testified that Dr. Caldwell gave her oral instructions to schedule Division 6 patients who need extractions for appointments in Division 5 on Thursdays. But even assuming Division 5 had the capacity to devote a full day each week to the care of Division 6 inmates, that still provides only 3 days a week in which Division 6 inmates can access care—and is still 40% below what Dr. Alexander said is the required staffing level.

Nonetheless, the Court agrees with Defendants that they are entitled to summary judgment on this theory of *Monell* liability because Bailey lacks evidence that inadequate staffing was the moving force behind any of the particular delays that he experienced. The most significant delay he experienced was between June 10, 2019, when he submitted his HSRF complaining of level "10" pain, and June 24, 2019,

when Dr. Street saw him and extracted tooth #25. But there is no evidence that the dental clinic knew about the HSRF but failed to schedule Bailey due to a lack of available appointments. According to Dr. Alexander, Division 6 never received Bailey's HSRF and instead learned about his problem on June 18, 2019, via a grievance that he filed on June 11, 2019. When Dr. Alexander received the grievance, she called Division 6 that day and had a dental assistant schedule Bailey for three days later, June 21, 2019. The appointment was subsequently rescheduled for June 24, 2019. But there is no evidence that was done due to lack of staffing or that any of Bailey's subsequent dental appointments were impacted by Division 6's staffing levels.

Therefore, the Court concludes that Defendant is entitled to summary judgment on the *Monell* claim to the extent it is premised on the staffing levels for Division 6. That said, staffing levels, as well as the lack of data available about whether those levels are adequate to meet inmate needs for urgent dental treatment, may be relevant to evaluating Bailey's claim of a "widespread pattern of delayed dental evaluations." [Dkt. 78 at 1.]

### 3.     Scheduling requests for dental services

Finally, Defendants argue that they are entitled to summary judgment on Bailey's *Monell* claim to the extent it is based on the Jail's decision to make the dental assistants solely responsible for scheduling appointments in response to HSRFs.[3] The

---

[3]     Defendants argue in their summary judgment reply brief that Bailey's response brief failed to address their argument that "he lacks evidence that assigning scheduling tasks to the dental assistant causes constitutional violations." [Dkt. 83 at 5.] But Bailey's argument is broader than that, focusing on "a widespread pattern of delayed dental

Seventh Circuit has recognized that "evidence of a widespread practice of failing to review inmates' timely filed medical requests can support a deliberate indifference" (or Due Process) "charge against the entity responsible for reviewing the requests." *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 487–88 (7th Cir. 2022) (quoting *Thomas*, 604 F.3d at 303). This is because an entity "faced with actual or constructive knowledge that its agents will probably violate constitutional rights, ... may not adopt a policy of inaction." *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (quoting *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004)); see also *Dixon*, 819 F.3d at 348 (to meet his burden to show that widespread practice of failing to review medical requests resulted in his injury, a plaintiff is required to show that the practice is "so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision"). Thus, "in situations where rules or regulations are required to remedy a potentially dangerous practice, the [sheriff's] failure to make a policy is also actionable." *Thomas*, 604 F.3d at 303. "When a plaintiff relies on a widespread practice to establish an entity's liability, 'proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference.'" *Reck*, 27 F.4th at 488 (quoting *Palmer*, 327 F.3d at 596).

---

evaluations" and lack of oversight of the scheduling process. [Dkt. 78 at 1; see also *id.* at 9 (disagreeing with Defendants that "there is no evidence of systemic deficiencies … with the procedure to schedule dental treatment").] This is consistent with his complaint, which alleges: "In addition to gross deficiencies in staffing, at all times relevant there have been systemic deficiencies with the scheduling of inmates for dental appointments that render dental treatment constitutionally inadequate for all inmates with serious dental ailments. Each clinic's dental assistant has complete responsibility to schedule patients for treatment. The dental assistants have no oversight by the clinic's assigned dentist. Routinely, inmates in need of urgent treatment by a dentist wait weeks, even longer, for dental appointments because of the policy to delegate scheduling to the dental assistant." [Dkt. 1, ¶ 30.]

In their motion for summary judgment, Defendants argue, correctly, that assigning scheduling tasks to dental assistants is not unconstitutional on its face and therefore, to survive summary judgment, Bailey must present evidence of a "prior pattern of similar violations." [Dkt. 72 at 10 (quoting *Harvey v. Dart*, 2021 WL 4264312, at *6–7 (N.D. Ill. Sept. 20, 2021)).] Defendants claim that Bailey "does not have any evidence that Defendants had knowledge dental assistants were repeatedly engaging in conduct that violated inmates' constitutional rights" and argue that the evidence actually "establishes the opposite." [*Id.* at 11.][4]

But the evidence Defendants rely on is largely disputed. First, Defendants claim that scheduling the dental appointment "is not the first step in the process for ensuring detainees receive adequate dental care," because "[w]hen a detainee submits an HSRF complaining of a toothache, the detainee is first seen by a nurse who assesses the detainee face-to-face." [Dkt. 72 at 11.] It is disputed whether this is actually the process followed at the jail. Division 6 charge nurse Dannydan testified

---

[4]     Defendants also argue in their summary judgment reply brief that Bailey's summary judgment response did not address their argument that "he lacks evidence that assigning scheduling tasks to the dental assistant causes constitutional violations." [Dkt. 83 at 5.] But Bailey's argument is broader than that, focusing on "a widespread pattern of delayed dental evaluations." [Dkt. 78 at 1; see also *id.* at 9 (disagreeing with Defendants that "there is no evidence of systemic deficiencies … with the procedure to schedule dental treatment"); *id.* at 14 (comparing this case to *Thompson*, which involved a "widespread practice of failing to review medical requests"). This is consistent with his complaint, which alleges: "In addition to gross deficiencies in staffing, at all times relevant there have been systemic deficiencies with the scheduling of inmates for dental appointments that render dental treatment constitutionally inadequate for all inmates with serious dental ailments. Each clinic's dental assistant has complete responsibility to schedule patients for treatment. The dental assistants have no oversight by the clinic's assigned dentist. Routinely, inmates in need of urgent treatment by a dentist wait weeks, even longer, for dental appointments because of the policy to delegate scheduling to the dental assistant." [Dkt. 1, ¶ 30.]

that the general practice is to conduct a paper triage of an HSRF when a detainee complains of dental pain rated 10 and to refer it to the dental office, unless "it's the weekend where there's no dental, we could do face to face and see what his condition is, what his pain is; and if needed, we can give him over the counter [medication]." [Dkt. 76 at 3.] Consistent with Nurse Dannydan's testimony, Bailey's June 9, 2019 HSRF states that it was "paper triaged by nurse," not that a face-to-face evaluation occurred. [Dkt. 71-24 at 21.] Further, Dr. Alexander testified that she did not know if Division 6 nurses were following guidelines to conduct a face-to-face evaluation. [Dkt. 76, ¶ 7.]

Second, Defendant states that "after the detainee is assessed by the nurse and given pain medication if indicated, the HSRF is referred to the dental clinic for scheduling." [Dkt. 72 at 11.] According to Defendant, the dental assistants are trained on scheduling urgent, priority, and routine dental appointments based on the subjective criteria a patient fills out on the HSRF. But as discussed above, it is disputed whether dental assistants are qualified to make such determinations. And the summary judgment record contains numerous examples of inmates that were not scheduled for care within 72 hours of reporting urgent dental conditions such as a pain level "6" or above (as discussed in more detail below).

Third, Defendants claim that Alexander "performs quarterly assessments to assess the productivity of the dental assistants by looking at their scheduling processes on the computer." [Dkt. 72 at 12.] But Bailey points out that the testimony on which it relies was provided by Alexander (in a different case) eight months prior

to Bailey being at the Jail. [See Dkt. 76, ¶ 14.] In a more recent deposition (also for another case), Alexander testified that her audits were "random"; she could not recall how frequently they were conducted or how many charts she would look at; she kept no written records concerning her audits; and she could not recall if audits were performed in May, June, or July 2019. [*Id.*, ¶¶ 14–15.] Dr. Alexander also testified that after the Justice Department stopped monitoring the timeliness of dental care, she stopped generating reports showing when every HSRF was submitted to dental and when the patient was seen. [*Id.*, ¶ 15.] Fourth, Defendants point out that Dr. Caldwell also conducted random audits of scheduling several times a year and, if she found instances where patients were not being seen within 72 hours of submitting an HSRF complaining of a toothache rated five or greater, she would address that with the dental assistant and other staff members. [Dkt. 72 at 12.] Bailey does not dispute this testimony, but points out that Dr. Caldwell also testified that she spends "very little" time conducting administrative duties because she is "mostly in clinic everyday" treating patients. [Dkt. 76, ¶ 17.]

Fifth, Defendant maintains that Bailey has no "evidence that the scheduling guidelines were regularly ignored by the dental assistants or that any alleged scheduling delay was the result of a dental assistant applying the scheduling guidelines." [Dkt. 72 at 12.] But this ignores the evidence proffered by Bailey that at least a dozen other inmates in his division around the same time period also complained of high levels of dental pain and were not scheduled to see a dentist within 72 hours of submitting their HSRFs. In particular:

29

- Pepe Martinez submitted an HSRF on March 7, 2019 complaining of dental pain rated "7", but waited until May 8, 2019 to be evaluated by a dentist;

- Zachary Mack submitted an HSRF on April 1, 2019 complaining of level "10" pain, but waited until April 29, 2019 for a dental evaluation;

- Jerry Jackson submitted an HSRF on February 26, 2019 complaining of level "10" pain, but was not evaluated by a dentist until April 29, 2019;

- Jeremy Jones submitted an HSRF on April 11, 2019 complaining of level "10 pain," and waited until April 29, 2019 for a dental evaluation;

- Danny Lowe complained of Level "10" pain on an HSRF submitted on March 5, 2019, and waited until April 8, 2019 for a dental evaluation;

- Richard Moody reported a "high" pain level of the HSRF he submitted on January 18, 2019 and did not receive a dental evaluation until March 21, 2019;

- Devonte Spencer submitted an HSRF on March 29, 2019 complaining of a "high" level of pain and waited until May 8, 2019 to be evaluated by a dentist;

- Rafael Ochoa submitted an HSRF dated August 1, 2019 complaining of level "10" pain but was not seen for an "urgent" appointment until August 13, 2019;

- Michael Zumma submitted an HSRF on November 18, 2019 complaining of level "10" pain and did not see a dentist until December 13, 2019;

- Valando Dixon put in an HSRF on June 25, 2019 complaining of level "10"pain, but was not scheduled to see a dentist for an "urgent" appointment until September 20, 2019;

- Ricking Hill submitted an HSRF on April 30, 2019 reporting level "10" pain and waited until May 13, 2019 for a dental evaluation; and

- Michael Nimock submitted an HSRF on April 22, 2019 complaining of a "high" level of pain and waited until May 3, 2019 to be evaluated by a dentist.

[Dkt. 82, ¶¶ 20-26; Dkt. 76, ¶¶ 25-26.] Defendants have not provided any explanation for why these inmates did not receive care within 72 hours. In her depositions, Dr. Alexander disclaimed any knowledge about the reasons for these delays, pinning all the responsibility on dental assistant Roddy, who can no longer remember the details about any of these patients.

Bailey compares this case to *Thompson v. Taylor*, 2016 WL 5080484 (N.D. Ill. Sept. 20, 2016), which involved a similar claim that the Cook County Jail's "widespread practice of failing to review medical requests resulted in [the plaintiff's] dental injury." [Dkt. 78 at 14 (quoting *Thompson*, 2016 WL 5080484).] The Court agrees that this case is instructive and will follow it here. In *Thompson*, a former inmate of the Cook County Jail brought suit against the Jail and one of its dentists based on allegations that they "were deliberately indifferent to his serious dental condition—a chipped tooth that was eventually extracted—and that their delay in providing treatment was a product of [Jail] policy." 2016 WL 5080484, at *1. It took the Jail approximately two weeks from Thompson filing a grievance complaining of "excruciating" dental pain until a dentist saw him and extracted the chipped tooth. See *id.* In granting reconsideration of her earlier summary judgment ruling in favor of the defendants, that court concluded that the plaintiff was entitled to take his

*Monell* claim to the jury based on the County's "widespread practice of delayed responses to inmate dental complaints." *Id.* at 7. The plaintiff relied on some of the same evidence that Bailey presents here: First, the Jail's "written policy call[ed] for a face-to-face evaluation by a nurse or other qualified health care professional in response to every HSR form complaining of dental pain," but the plaintiff "offered evidence that this is not the actual practice" at the Jail. *Id.* Second, the plaintiff never received a face-to-face evaluation with a nurse, and at least one nurse "did not know whether face-to-face evaluations occurred when processing forms for dental pain." *Id.* And third, the plaintiff's "medical records show an eight-day delay between when his first HSR form was reviewed by medical personnel and when it was reviewed by dental staff." *Id.*

As in *Thompson*, the evidence in this case "goes beyond an isolated act of an individual employee." *Thompson*, 2016 WL 5080484, at *8. Rather, Bailey has "presented evidence of gaps in the policies and practices that led to the delay in Bailey's case, and a jury could infer that the violation reflects a widespread issue." *Id.* The Court finds it notable that during the DOJ monitoring period, Dr. Alexander kept track of when HSRFs were received by the dental clinic and when the patients received treatment. But she stopped tracking this after the monitoring period ended, despite the concerns that she and Dr. Prozorovsky expressed that the Division 6 "DOJ numbers were horrible" in the last monitoring report and HSRFs were not being timely scheduled. [Dkt. 76, ¶ 76.] Dr. Alexander also made the decision to abandon use of the "dentalreferral@cookcountyhhs.org" system. [*Id.*, ¶ 19.] Dr. Alexander

testified that, other than data submitted to the Justice Department, she was not aware of any other data regarding the wait times for a patient to be evaluated in a dental clinic at the jail. [Dkt. 82, ¶ 19(a).] This record suggests that Dr. Alexander and the Prison knew that Division 6 did not have a functional system for scheduling urgent dental requests. Instead of making any efforts to address the problem, it stopped collecting any data and placed the blame solely on the dental assistants, who were hamstrung for a variety of reasons beyond their control.

On this record, Defendants are not entitled to summary judgment on Bailey's *Monell* claim to the extent it is premised on Defendants' systemic deficiencies with the scheduling of inmates for dental appointments, including their decision to leave scheduling solely to the dental assistants. See, e.g., *Daniel v. Cook County*, 833 F.3d 728, 734-36 (7th Cir. 2016) (genuine issue of material fact existed as to whether pretrial detainee's injury resulted from systemic deficiencies in county jail's medical scheduling and record keeping, precluding summary judgment in detainee's § 1983 medical deliberate indifference action against sheriff's office, sheriff, and county); *Thomas*, 604 F.3d at 303-304 (jury must be allowed to decide whether County had custom or practice of failing to timely review jail inmates' medical requests, and whether it had a causal link to pretrial detainee's death from pneumococcal meningitis, where summary judgment record contained testimony from medical providers that there was a practice of not retrieving inmate medical requests on daily basis, as well as testimony from other inmates that they filed numerous medical requests on detainee's behalf); *Davis v. Carter*, 452 F.3d 686, 692-93 (7th Cir. 2006)

(genuine issue of material fact as to whether county had widespread practice or custom of inordinate delay in providing methadone treatment to inmates precluded summary judgment in action alleging that county was liable under § 1983 for inmate's death in county jail due to sudden withdrawal from his prescribed methadone medication).

## IV.    Conclusion

For these reasons, Defendants' motion for summary judgment [Dkt. 70] is granted in part and denied in part. Defendants are entitled to summary judgment on Bailey's *Monell* claim to the extent that it is premised on (1) the alleged understaffing of the Division 6 dental clinic or (2) inoperable suction equipment in Division 6. Defendants are not entitled to summary judgment on the *Monell* claim to the extent that it is based on an alleged widespread pattern of delayed dental evaluations.

Enter: 21-cv-3196
Date:  September 29, 2023

_____
Lindsay C. Jenkins
United States District Judge